IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

HANNAH STRELCHENKO,

                Plaintiff,

  v.                                               OPINION & ORDER

STATE OF WISCONSIN DEPARTMENT OF            17-cv-770-jdp
REVENUE,

                Defendant.

---

Plaintiff Hannah Strelchenko is suing her former employer, the Wisconsin Department of Revenue, for sex discrimination under Title VII of the Civil Rights Act, 42 U.SC. § 2000e-2(a). The department has filed a motion for summary judgment, Dkt. 9, which is ready for review.

Strelchenko alleges that the department fired her because it did not want to hire and train a temporary replacement for her while she was on maternity leave. But Strelchenko hasn't adduced any evidence to support that allegation. The undisputed facts show that the department terminated her because she artificially inflated her performance statistics by falsely taking credit for more than 100 tasks that she didn't actually perform. No reasonable jury could find that the department discriminated against Strelchenko because of her pregnancy, so the court will grant the department's motion for summary judgment.

UNDISPUTED FACTS

The following facts are undisputed, unless otherwise noted.

Strelchenko began working for the Wisconsin Department of Revenue in 2013 as a revenue agent in the central compliance office, which collects taxes from delinquent taxpayers.

Like all new hires, Strelchenko was required to undergo an 18-month probationary period. Strelchenko's husband, Alexei, worked as a revenue agent in the department as well. (In her summary judgment materials, Strelchenko refers to herself as "Strelchenko" and her husband as "Alexei," so the court will do the same.) Robert Frauchiger was Strelchenko's immediate supervisor, but not Alexei's.

Among a revenue agent's responsibilities is reviewing mail returned by the post office and attempting to determine a taxpayer's correct address. Strelchenko received training on the appropriate way to do this. If the post office did not provide a forwarding address, the agent would review the department's databases to attempt to identify the taxpayer's most recent address. Agents were instructed as to which databases they could use and they were counseled to avoid sending mail to an incorrect address, which could result in the disclosure of confidential and sensitive information to the wrong person. If the agent found the correct address, she would update the taxpayer's information. Otherwise, she would note that she could not locate the correct address.

The department evaluated an agent's performance by looking at the number of tasks she performed. An agent was expected to perform at least 85% of the average performance of other workers in their unit.

In January 2014, Strelchenko received a six-month performance review from Frauchiger. Among the comments on the review was that she "should show improvement for standards on phone/correspondence and be able to consistently meet the standard of 85% of average by the end of one year." Her overall rating was "exceeds expectations." In April 2014, Frauchiger met with Strelchenko and then issued a memo stating that she "is moving in the right direction," but needed to work on her statistics related to correspondence.

In May 2014, Strelchenko discovered that she was pregnant. The following month, Strelchenko informed Frauchiger. In response, Frauchiger gave Strelchenko information about taking medical leave, as he does with all employees who notify him of a long-term medical condition.

In June 2014, Alexei's supervisor, Henretta White, observed that Alexei's performance statistics had increased from 49% to 212%. After investigating the matter, White determined that Alexei had processed numerous pieces of returned mail without attempting to update the taxpayer's address. When White informed Steve Gorton (the revenue administration manager) what she observed, Gorton directed White and Frauchiger to conduct an audit of the agents under their supervision.

White's audit revealed that two agents had processed returned mail without attempting to update the taxpayer's address.[1] Edward Mulroy had seven such occurrences; Alexei had more than 1,000 occurrences. After meeting with Mulroy, White determined that Mulroy was not trying to inflate his performance statistics, in part because he did not previously have low performance statistics. White decided that Mulroy should receive additional training. As for Alexei, he resigned before the department took any disciplinary action against him.

Frauchiger's audit also revealed that two agents had processed returned mail without attempting to update the taxpayer's addresses, Strelchenko and another employee, whom the parties don't identify by name. The other employee had engaged in that conduct twice. Frauchiger considered that to be "de minimis."

---

[1] The department's data system allows a supervisor to determine how long an agent spent on a task and which sources, if any, the agent reviewed to find an updated address.

As for Strelchenko, the audit revealed the following information: (1) she had processed an average of 30 to 35 pieces of returned mail in the months before June 2014; (2) in May 2014, she processed 32 pieces of returned mail and in June 2014, she processed 174 pieces of returned mail; and (3) she did not review the taxpayer's account or consult any other sources for updated information as to 25 of the pieces of mail processed in May and as to 130 of the pieces of mail processed in June.

Frauchiger had expected to see a small number of errors or anomalies because an agent might open a task and then close it quickly because of distraction or a lunch break. But he thought it was unusual to see that one agent had more than 10 errors or anomalies. As a result of the audit, Gorton directed Frauchiger to initiate an investigation into possible violations of work rules by Strelchenko.

At an August 2014 meeting with Frauchiger, Strelchenko admitted that she did not follow the proper procedure in processing returned mail and that she increased her performance statistics by processing a large amount of returned mail without searching for a better forwarding address. Strelchenko said that other agents had done the same thing, but she did not identify anyone. She also expressed a concern about using the wrong database to update taxpayer accounts and causing a security breach.

Frauchiger sent a memo to Gorton and Cathy Bink (the compliance bureau director) that included the following discussion:

> My conclusion of this investigation is that violation of work rules . . . did take place. Hannah knew the proper procedure for [processing returned mail] and chose not to follow this procedure contrary to instruction from management and to the detriment of other agents so that her statistics would look better. Taxpayers did not receive mail because addresses were not updated.
>
> I recommend the appropriate level of progressive discipline.

After reviewing Frauchiger's memo, Bink wrote her own memo, in which she documented what she called "concerns" about Strelchenko:

- Hannah knew how to do the work, but started doing it incorrectly to increase her production

- What Hannah did is equivalent to taking a stack of correspondence and throwing it into the garbage without working on it

- She stated she heard other agents are doing the work incorrectly but refused to provide a name or names

- She is borderline on quantity of work completed

- We now have a trust issue – will she cheat and just close mail cases rather than doing the actual work, if her production numbers are low

When Bink is informed of employee misconduct in her bureau, she reviews the results of the investigation and makes a disciplinary recommendation to Diane Hardt (the administrator for the division of income, sales, and excise tax), or Vicki Gibbons (the deputy administrator). After Bink spoke to Gibbons, Gibbons recommended to Hardt that Strelchenko be terminated. Gibbons was not aware that Strelchenko was pregnant at the time.

Hardt has the final say in hiring and firing decisions in the division. She decided to terminate Strelchenko, providing the following explanation in a letter:

> [Y]ou were negligent in the performance of your job duties. Specifically, you were intentionally assigning work to yourself and then failed to complete the work as required on over 150 taxpayer accounts in May and June 2014. You did not review the accounts in WINPAS at the various account levels as required and according to established procedures. You did not take the appropriate actions nor did you enter any notes documenting your review, as required and according to established procedures, Rather, you assigned the accounts to yourself and then closed the accounts immediately. Your deliberate mishandling of these accounts resulted in these taxpayers not receiving collection

5

> notices from the Department of Revenue. It appears your concern was solely your production statistics and not servicing taxpayers.
>
> Your deliberate mishandling of these accounts is a detriment not only to those taxpayers, but also to the department. Your deceit and dishonesty in falsifying records to manipulate your production statistics is unacceptable behavior for a Department of Revenue employee and has compromised management's confidence in your ability to perform your job functions. Due to my distrust in your ability to perform the required actions as a Revenue Agent, I have decided to terminate your employment with the Department of Revenue.

At the time Hardt made her decision, she was not aware that Strelchenko was pregnant.

The court will discuss additional facts as they become relevant to the analysis.

ANALYSIS

A. Overview of Strelchenko's claim

Title VII of the Civil Right Act of 1964 prohibits workplace discrimination because of sex, which includes pregnancy discrimination. 42 U.S.C. § 2000e(k) and § 2000e-2(a). In the context of a motion for summary judgment, courts have analyzed Title VII claims under different evidentiary frameworks, called the "direct" and "indirect" methods. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 763 (7th Cir. 2016). But the court of appeals has observed that the different methods have "complicated and sidetracked employment-discrimination litigation for many years." *Id.* at 764. The better approach is to consider the evidence "as a whole," focusing on the appropriate legal standard on summary judgment, which "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765. That is the course the court will follow in this case.

Before assessing the evidence that Strelchenko cites in support of her claim, it is important to establish the scope of her allegations. First, she is not alleging that Frauchiger or anyone else fabricated the rule violations that led to her termination. It is undisputed that Strelchenko knew how to process mail that was returned by the post office and that she violated the department's rules on more than 100 occasions so that she could inflate her performance statistics. And she does not try to contradict or undermine her supervisors' concerns that many taxpayers did not receive collection notices from the department as a result of her conduct.

Second, Strelchenko doesn't cite any evidence that the decision to conduct an audit had anything to do with her pregnancy. Rather, Frauchiger conducted an audit at the direction of the revenue administration manager after Alexei's supervisor discovered that Alexei had been inflating his statistics.

Third, it is undisputed that Diane Hardt, the person who made the final decision to fire Strelchenko, did not know that Strelchenko was pregnant at the time of the decision. Thus, Strelchenko must show that someone else harbored discriminatory animus against her and caused Hardt to fire her. *Robinson v. Perales*, 894 F.3d 818, 832 (7th Cir. 2018) (under "cat's paw" theory, "[t]he plaintiff must provide evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action.") (internal quotations omitted).

Strelchenko's theory in her brief focuses on her supervisor, Rob Frauchiger. Strelchenko says that, after she told Frauchiger that she was pregnant, he realized that she would be on leave during the department's busiest time of year. He decided that he "wanted . . . Strelchenko out of the workplace sooner rather than later, because he knew otherwise he would have to go

7

through the laborious training program for a Revenue Agent who would be at the DOR for 12 weeks, or fewer." Dkt. 19, at 1. As a result, he persuaded Hardt to terminate Strelchenko for a rule violation, even though "many of [Strelchenko's] peers were committing the same rule violation or other violations." *Id.* at 2. The court will consider all of the evidence that Strelchenko has adduced in support of this theory.

**B. Evidence of Frauchiger's animus**

The parties dispute whether Frauchiger recommended that Strelchenko be terminated, so the court will assume that he did.[2] The question is whether there is any evidence to support Strelchenko's theory that Frauchiger "wanted [her] out" because of her pregnancy. She says that someone in the human resources department "attempted to discourage both her and Alexei from taking off at the same time, or to take all of the leave to which they were entitled." Dkt. 25, ¶ 22. But this testimony is irrelevant because Strelchenko does not cite evidence showing that the human resources employee was involved in the decision to fire her, that the employee ever spoke to Frauchiger about the issue, or that Frauchiger shared the employee's view. Rather, it is undisputed that Frauchiger's reaction to learning that Strelchenko was pregnant was to provide her the forms she needed to request leave. Strelchenko does not allege that Frauchiger's words or actions were indicative of hostility toward her pregnancy or her need to take leave.

---

[2] Frauchiger denies that he made such a recommendation. Dkt. 24, ¶ 76. And in his August 2014 memo he recommended only that Strelchenko receive "progressive discipline." *Id.,* ¶ 72. But Hardt initially testified that Frauchiger recommended in writing that Strelchenko be terminated. Dkt. 27 (Hardt Dep. 26:24–25:15). Later in her deposition, Hardt said that she didn't "know if he recommended termination." *Id.* at 43:9–10. In a declaration prepared after her deposition, Hardt said that Frauchiger did not recommend termination, only progressive discipline, as stated in his memo. Dkt. 14, ¶¶ 8–11. Although Strelchenko has not submitted a copy of another memo or any evidence that Frauchiger met with Hardt in person, the court will assume that Hardt's initial testimony is sufficient to raise a genuine dispute as to whether Frauchiger recommended to Hardt in some way that Strelchenko should be fired.

8

## C. Treatment of other employees

Strelchenko identifies several other agents who also engaged in misconduct but were not terminated. She says that is evidence of discrimination, but that would be true only if the other employees were similarly situated to her. *Eaton v. Indiana Dept. of Corr.*, 657 F.3d 551, 559 (7th Cir. 2011). Strelchenko has failed to make that showing.

### 1. Other agents who processed returned mail without attempting to update the taxpayer's address

Strelchenko alleges generally that other employees were processing returned mail the same way she was. But it is undisputed that the audit revealed that only one other person under Frauchiger's supervision had engaged in the same conduct as Strelchenko. Because the other employee had only two incidents and Strelchenko had well over 100, she is not similarly situated to the other employee. *Weber v. Universities Research Ass'n, Inc.*, 621 F.3d 589, 594–95 (7th Cir. 2010) (other employees not similarly situated to the plaintiff because "[n]one of the men that [the plaintiff] identified as comparators violated [the employer's] policy to the degree that [the plaintiff] did"). And Strelchenko doesn't allege that Frauchiger was aware of any other employees who had engaged in the same conduct. *Smart v. Int'l Brotherhood of Elec. Workers*, 315 F.3d 721, 728 (7th Cir. 2002) (other employee's more favorable treatment not evidence of discrimination if the employer was unaware that other employee had engaged in same conduct as the plaintiff).

### 2. Emmanuel Ekezie

Strelchenko cites her own testimony for the proposition that Ekezie "showed Strelchenko early in her employment that he could manipulate the system so he received credit for doing work he did not actually perform." Dkt. 25, ¶ 42. Strelchenko doesn't explain what

that means, but regardless whether Ekezie engaged in similar conduct, this allegation is irrelevant because Strelchenko has not cited any evidence that she ever told Frauchiger about Ekezie's conduct or that Frauchiger otherwise knew about it. *Smart*, 315 F.3d at 728.

### 3. Brian Fey

Strelchenko says that Fey performed work outside the department without seeking approval first. That conduct is not obviously similar to Strelchenko's, but, even if it is, the testimony Strelchenko cites shows that Frauchiger did not supervise Fey, Henretta White did. Dkt. 28 (Frauchiger Dep. 42:18–43:11). More lenient treatment by one supervisor is not evidence of another supervisor's discriminatory intent. *Ellis v. United Parcel Service, Inc.*, 523 F.3d 823, 826–27 (7th Cir. 2008) ("Different decisionmakers may rely on different factors when deciding whether, and how severely, to discipline an employee. So, to be similarly situated, [an employee] must have been treated more favorably by the same decisionmaker that fired the [plaintiff].").

### 4. Seth Kussmaul

Strelchenko says that Kussmaul "was manipulating work queues." Dkt. 25, ¶ 47. Again, Strelchenko doesn't explain what this means. *Williams v. Airborne Exp., Inc.*, 521 F.3d 765, 768 (7th Cir. 2008) ("[The plaintiff] did not supply details about these other incidents and thus could not establish that he and [the other employee] engaged in similar behavior."). Regardless, Frauchiger testified that he wasn't aware of any misconduct by Kussmaul. Dkt. 28 (Frauchiger Dep. 35:10–36:22). Strelchenko doesn't cite any contrary evidence.

### 5. Julie Reis

Strelchenko says that Reis "fail[ed] to protect taxpayer information," but Hardt disciplined Reis without terminating her. Dkt. 25, ¶ 52. Because it is undisputed that Hardt

10

didn't know that Strelchenko was pregnant when Hardt terminated her, any differential treatment by Hardt is not probative of discriminatory intent. *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1006 (7th Cir. 2000) ("[The plaintiff's] claim of pregnancy discrimination . . . cannot be based on her being pregnant if [the employer] did not know she was.").

### 6. Phillip Sigurslid

Strelchenko says that Sigurslid "engaged in substantially similar conduct to that in which Strelchenko was accused of having engaged." Dkt. 25, ¶ 57. Again, Strelchenko doesn't explain in her proposed findings of fact what that means. In any event, she acknowledges in her deposition that she did not personally observe Sigurslid's conduct but rather heard about it from employees other than Sigurslid, so the testimony is inadmissible hearsay. *Flanagan v. Office of Chief Judge of Circuit Court of Cook Cty., Illinois*, 893 F.3d 372, 375 (7th Cir. 2018) (plaintiff's testimony about what a coworker told her about another coworker is inadmissible hearsay). And even if Strelchenko had personal knowledge of Sigurslid's conduct, she does not allege that Frauchiger was aware of any misconduct by him.

### D. Mitigating factors

Strelchenko also attempts to support her claim by raising potential mitigating factors that she believes the department should have considered. Specifically, she says that Frauchiger knew that: (1) "at least one more experienced employee had instructed her to quit trying to find correct addresses"; and (2) "Strelchenko[] [had a] legitimate concern about getting in trouble for committing a security breach, given the acknowledged deficiencies in the database." Dkt. 19, at 6.

The first allegation is not supported by the evidence. The testimony Strelchenko cites in support of that allegation says only that other agents were engaging in the same conduct she

was. Dkt. 26 (Strelchenko Dep. 55:19–56:25). The court has already addressed that allegation in the previous section.

As to the second allegation, it is undisputed that Strelchenko told Frauchiger that she was concerned about a security breach. But it borders on the absurd to suggest that Frauchiger should have taken that statement into account. Strelchenko admits that she made *no* effort to update addresses in more than 100 cases and that she did so to inflate her performance statistics. She also admits that she knew that she was processing mail incorrectly and that she was instructed on which databases she should use to update an address. She does not allege that Frauchiger told her to skip the step of trying to update a taxpayer's address because of privacy concerns or that she had any reason to believe that she would be disciplined if she updated an address using the department's databases.

In any event, it is irrelevant whether there may have been extenuating circumstances for Strelchenko's misconduct. The question is whether the department discriminated against Strelchenko because of her pregnancy, not whether the department's decision was reasonable or fair. *Simpson v. Beaver Dam Cmty. Hospitals, Inc.*, 780 F.3d 784, 795 (7th Cir. 2015). Because Strelchenko has not cited any evidence that the relevant decision makers held her to a higher standard than other employees, evidence that the department fired her despite mitigating factors is not probative of discrimination.

E.  **Inconsistent testimony**

Strelchenko says that her "strongest piece[]" of evidence is the inconsistent testimony that Hardt gave about whether Frauchiger recommended that Strelchenko be terminated. Dkt. 19, at 7–8. As discussed in footnote 2, Hardt initially testified in her deposition that Frauchiger gave her a written recommendation to terminate Strelchenko, but later said that he had not

done so. Strelchenko says that Hardt's "shifting, inconsistent conduct is the kind of behavior one encounters when an employer is attempting to hide the real reason for a termination." Dkt. 19, at 8. And she says that, regardless what Frauchiger actually did, the evidence points toward discriminatory intent:

> If Frauchiger did not make the recommendation, a jury could conclude that Hardt lied about it, knowing that Frauchiger actually told her that Strelchenko was a good employee who deserved a second chance. Or it could conclude that Frauchiger did make the recommendation, thus breaking protocol and directly contradicting what he told Strelchenko at her termination meeting about her good performance.

*Id.*

Strelchenko's argument fails for multiple reasons. First, the only written recommendation from Frauchiger that is in the record says nothing about termination. It recommends "progressive discipline." Strelchenko does not allege that there is another recommendation that the department failed to produce in discovery, which strongly suggests that Hardt was simply mistaken when she stated initially that Frauchiger had written a recommendation to terminate Strelchenko.

Second, regardless whether Hardt was initially mistaken in her deposition or simply lied, the inconsistency does not create a genuine issue of material fact. Shifting explanations about an employer's *reasons* for firing an employee may support an inference of discrimination. *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 487 (7th Cir. 2015). But a plaintiff cannot prove a discrimination claim simply by pointing to any inconsistency in the record. When the employer's reasons for terminating the plaintiff are consistent, as they are in this case, "differing recollections over exactly who spoke with whom do not call [the employer's reasons] into question." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 881 82 (7th Cir. 2016).

13

The facts in this case show why the type of inconsistency Strelchenko alleges is not probative of discrimination. If Frauchiger did not make a recommendation to fire Strelchenko, it means that Hardt relied on her own judgment and that of Cathy Bink and Vicki Gibbons. Because Strelchenko does not allege that any of those individuals knew that Strelchenko was pregnant at the relevant time, they could not have relied on that fact in deciding whether to terminate her. And if Frauchiger did make a recommendation to fire Strelchenko, it means that Strelchenko would have to adduce evidence that Frauchiger made that recommendation because of her pregnancy. As discussed above, Strelchenko has not adduced evidence that Frauchiger was reluctant to allow her to take pregnancy leave, that he was fabricating allegations of misconduct, or that he treated her less favorably than similarly situated employees under his supervision. In short, because Strelchenko points to no evidence that either Frauchiger or Hardt discriminated against her, it simply does not matter whether or not Frauchiger recommended that Strelchenko be terminated.

**F. Indirect method**

Strelchenko includes a separate argument in her brief under the burden shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which is often referred to as the "indirect" method of proof. *E.g.*, *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499–500 (7th Cir. 2017). But the court has already considered all of the evidence Strelchenko submitted, so it is unnecessary to conduct a separate analysis under *McDonnell Douglas.* In any event, the indirect method requires Strelchenko to show that the department treated her less favorably than similarly situated employees who were not pregnant. *Ferrill*, 860 F.3d at 500. Because the court has already concluded that Strelchenko has not made that showing, she cannot prevail under the indirect method either.

14

**G. Conclusion**

This is not a close case. Because Strelchenko has failed to adduce any evidence in support of her claim for pregnancy discrimination, the court will grant the department's motion for summary judgment.

ORDER

IT IS ORDERED that defendant Wisconsin Department of Revenue's motion for summary judgment, Dkt. 9, is GRANTED. The clerk of court is directed to enter judgment and close this case.

Entered September 21, 2018.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge